# Supreme Court of Florida

_____

No. SC14-62
_____

**JOHN SEXTON,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[June 29, 2017]

PER CURIAM.

John Sexton appeals his conviction for the first-degree murder of Ann Parlato and sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons explained below, we affirm Sexton's conviction but reverse his sentence of death and remand this case to the trial court for a new penalty phase.

## I. BACKGROUND

Ann Parlato was a ninety-four-year-old woman who lived alone in her Pasco County home. John Sexton began cutting her lawn in the summer of 2010. On September 23, 2010, a friend of Parlato's found her deceased on her living room

floor. Her face had been bludgeoned to the point of being unrecognizable, and her naked body was partially covered with a white sheet. There was blood spatter all around her head. Her right breast had been cut off and a prosthetic breast pad (which Parlato owned due to a prior mastectomy of her left breast) was placed over the area where her right breast had been. The excised right breast was on the floor near Parlato's head. A vase protruded from her rectum. A purse had been placed between her legs and set on fire, burning her genital and thigh areas. A knife was on the floor near her body.

Despite having been cleaned two days earlier, Parlato's home was in complete disarray. The front door was left partially open and the foyer was covered in dirt and leaves. Various objects had been pulled out of drawers and were on the floor in the living room. There was blood in the foyer, in the living room, on the curtain above the kitchen sink, on a stool in the shower in the master bathroom, on the floor and shower curtain in the hall bathroom, and on the door and sheets in Parlato's bedroom. The kitchen was a mess, with food strewn about on the floor. Several kitchen knives were in the basin of the kitchen sink. A large wooden clock in the living room had a knife protruding from the top of it. Bottles of cleaner that appeared to have been opened were on the floor near the washer and dryer, and a bottle of bleach had blood on it. There were bloodstains on the exteriors of the washer and dryer. There was what appeared to be a bloody

handprint on the dryer.  There were also bloodstains inside the washer, as well as some grass, cigarette butts, and several items of clothing.  The contents of the washer were wet, as if they had been through the wash cycle.  There were Band-Aid wrappers and a Band-Aid box on the kitchen counter.  Although Parlato had asthma and did not allow smoking in her home, there were cigarette ashes in the dining room and on a footstool in the living room and cigarette butts in the kitchen trashcan and the toilet, in addition to the washing machine.

Dr. Jonathan Thogmartin, the medical examiner, observed Parlato's body as it was found at the crime scene and subsequently conducted the autopsy.  He determined the cause of Parlato's death to be blunt trauma to the face, head, and neck and the manner of death to be homicide.  The autopsy revealed that Parlato's cheek bones, eye sockets, and chin were crushed.  Her jaw was broken and dislocated.  She suffered multiple lacerations, blunt force impacts, rib fractures, a dislocated spine, and bruising to the brain.  There were five vaginal lacerations or tears, which were consistent with a forcible sexual battery having occurred.  Dr. Thogmartin determined that the removal of the right breast, insertion of the vase, burning, and a stab wound to the abdomen occurred postmortem.

An expert in blood pattern analysis and crime scene reconstruction determined that Parlato was struck by at least three impact blows in the foyer area. And an impact bloodstain on a chair in the living room indicated another forceful

blow. At least seven other forceful blows were indicated by stains in the area where her body was found. Parlato's upper body was in a raised position during one blow and her head was on the floor for the remainder of the blows. Blood in other areas of the home indicated that the perpetrator moved around the home after the attack. Three circles on the living room floor were consistent with the size of the bottom of a two-gallon bucket found in the house and indicated an attempt to clean up. The cleanup attempt was corroborated by the odor of bleach in the house.

Devlynn Saunders, David Carlin, and Patrick Grattan lived together in the house next door to Parlato's. Around 11:30 p.m. on September 22, Carlin went outside to smoke a cigarette. At that time, he did not notice a truck in Parlato's driveway or anything unusual about her house. Around midnight, all three of the roommates heard a loud boom or thud coming from the direction of Parlato's house. When they went outside to investigate the noise, they saw a truck parked in Parlato's driveway and, through an open kitchen window and open curtains, observed a man standing at her kitchen sink. The man appeared to be doing dishes; the water was running and items were clanking around in the sink. Saunders and Carlin recognized the man as Sexton because they had seen him cutting Parlato's grass and he had approached them on several occasions inquiring whether they were interested in his lawn care services. They also recognized the

truck in Parlato's driveway as Sexton's. They thought it was odd that Sexton was at Parlato's at such a late hour, but they were not too concerned because Parlato was a "night owl." They assumed that maybe Sexton was helping Parlato with something and decided just to take down the license plate number from the truck and go back to bed. After learning of Parlato's murder the next day, Carlin provided the plate number from the truck to the police, who confirmed that the truck was registered to Sexton and his wife, Catherine. Although Saunders and Carlin were unable to pick Sexton out from sets of six photographs shown to them by police, they both identified him at trial as the man they saw in Parlato's kitchen after midnight on September 23, 2010.

Several hours after Parlato's body was discovered, Pasco County Sheriff's Detectives Robert Grady and Jason Hatcher went to speak with Sexton at his home, which was located less than a mile from Parlato's house. Sexton was standing outside when the detectives arrived. He was wearing a gray T-shirt and khaki shorts, which appeared to have bloodstains on them. When the detectives approached, Sexton appeared nervous, his hands were shaking, and he kept trying to turn his knuckles inwards. Sexton had a small, half-moon-shaped cut on his right knuckle, which he said was caused by a razor blade he used to trim a tree earlier that week. The conversation was recorded by a device in Detective Hatcher's pocket.

The detectives told Sexton that they were there because Parlato had been murdered. Sexton acted surprised by the news. He said he had last seen Parlato the night before when he stopped by her house around 8 p.m. or 8:30 p.m. to ask if she wanted any more work done in her yard. He said that he was only there for about ten minutes and had talked to Parlato in her foyer. Sexton said that after he left Parlato's, he went to a bar for one beer and then he drove around and had another beer in the car before going home around 10:30 p.m.

During the conversation, Sexton's wife, Catherine, came outside, and Sexton told her that Parlato had been murdered. Sexton asked Catherine what time he got home the night before. He asked her, "10:30, maybe? Something like that?" and then stated, "She doesn't remember." Detective Grady said that Catherine then said to him in a quiet voice, which was not picked up by the recording device, "He's not telling the truth. He got home at 2:00 a.m."

When Sexton was told that a neighbor had seen him in Parlato's kitchen and his truck in Parlato's driveway much later than 8:30 p.m., Sexton said that was not possible. Before going with the detectives to the Sheriff's Office, Sexton provided a DNA sample, the shirt and shorts he was wearing—which he said were the same clothes he wore to Parlato's the night before—and the boots he had been wearing the night before.

At trial, Catherine testified that she and Sexton were arguing on the evening of September 22, 2010, because Sexton was drinking beer. She saw him around 7 p.m. at one of his lawn jobs, and he appeared a little bit impaired. She went looking for him later and encountered him again around 9:30 p.m. in the driveway of a vacant house. He appeared to have drunk more beer since she had seen him around 7 p.m., and they continued to argue. She then saw him come out of a convenience store around 9:45 p.m. with more beer. The store's surveillance tape, which was introduced at trial, showed Sexton leaving the store at 9:47 p.m. There were no blood stains on his clothes at that time. At that point, Catherine was concerned about Sexton's well-being and she called 911 to report that Sexton was drinking and driving. Catherine went home and tried many times to call Sexton, but he did not answer. She went to bed around 1:45 a.m., and Sexton knocked on the door around 1:55 a.m. Catherine let Sexton in but made him sleep on the couch.

A DNA analyst from the Florida Department of Law Enforcement (FDLE), Lisa Thomas, analyzed the clothes Sexton was wearing when Parlato was murdered, swabbings and clippings taken from Sexton's hands on September 23, 2010, and some of the knives found in Parlato's home. The stains on Sexton's clothing and a swab from his boots tested presumptively positive for the presence of blood. And despite the fact that it appeared that the clothes had been washed

after they were stained, Thomas was able to obtain a DNA profile from the stains and the boot swab, both of which matched the known DNA profile of Parlato, with the frequency of that profile occurring in the population at random being approximately 1 in 69 trillion. A swabbing of the cuticles from Sexton's right hand tested presumptively positive for the presence of blood, and a DNA mixture profile obtained from the swab matched Parlato's DNA with the likelihood of a random match being 1 in 420,000. A DNA mixture obtained from fingernail clippings from Sexton's right hand matched Parlato's DNA with the likelihood of a random match being 1 in 4,200. The foreign DNA on the cuticles of Sexton's left hand matched Parlato's DNA with the likelihood of a random match being 1 in 76 million.

Thomas concluded that DNA on the blade of a knife found in Parlato's kitchen sink matched Parlato's DNA with the likelihood of a random match being 1 in 69 trillion. Parlato's DNA was also on the handle of that knife along with DNA from another individual. The DNA on the knife handle that did not match Parlato's DNA could have originated from Sexton, but Thomas did not have enough information to include him as a possible contributor. DNA on the blade—which tested presumptively positive for the presence of blood—and handle of the knife found in the clock in Parlato's home matched Parlato with the likelihood of a random match being 1 in 69 trillion. A partial DNA profile (DNA was present at

12 of the 13 loci tested) on the blade of the knife found on the living room floor also matched Parlato's DNA with the likelihood of a random match being slightly less than 1 in 69 trillion.

Another FDLE DNA analyst, Sean Michaels, obtained a DNA profile from the cigarette butt found in Parlato's kitchen trashcan and determined that it matched Sexton's, with the likelihood of a random match being 1 in 150 quadrillion.

A footwear impression analyst from FDLE analyzed the footwear impressions left at Parlato's house and Sexton's boots. She concluded that five right footwear impressions left at the scene could have been made by Sexton's right boot.

Sexton did not testify at trial. The jury was instructed on theories of both first-degree premeditated murder and first-degree felony murder and returned a general verdict finding Sexton guilty of first-degree murder. After the penalty phase, the jury recommended that a sentence of death be imposed by a vote of 10-2. The trial court ultimately followed the jury's recommendation.

## II.  ANALYSIS

Sexton raises four guilt phase issues and eight penalty phase issues on appeal. We address Sexton's guilt phase issues as well as sufficiency of the evidence but as to the penalty phase, we address only the dispositive issue.

## A. Cross-examination of DNA Analysts

Sexton contends that the trial court erred by denying him the opportunity to cross-examine FDLE DNA analysts Lisa Thomas and Sean Michaels regarding prior instances of contamination in analyses they conducted in other cases. We disagree.

Thomas testified during a pretrial deposition that while employed by FDLE from 2006-2011, she had approximately six to ten instances of various errors in other cases, including contamination, carryover, unexplained profiles, and mislabeling of samples, all of which occurred prior to her work on Sexton's case. Each time an error arose, she completed a form to document the error or contamination event and to explain which cases were affected, what she believed went wrong, and how she would prevent the error from recurring.

Michaels testified during a pretrial deposition that he had approximately three or four instances of contamination in the six years he had worked for FDLE, the most recent of which was in 2010 or 2011, before he worked on Sexton's case in 2012. He documented the prior instances of contamination in a log, in which he explained what could have caused the contamination in those analyses.

The State filed a motion in limine to preclude the defense from questioning Thomas at trial regarding her prior instances of contamination in other cases, arguing that acts of misconduct are not admissible for impeachment. Sexton

- 10 -

responded that evidence of prior contamination tended to show that Thomas "might not be credible in observing what she's testifying about," but he admitted that all FDLE protocols were followed in this case and that there was no evidence of any error in the DNA analysis. The trial court granted the motion in limine, ruling that the prior instances of contamination were not relevant to Thomas's actions in this case and that the defense could not question her about those prior instances unless she were to testify that she never had any issues with contamination.

At trial, Thomas did not testify that she never had any issues with contamination, but Sexton requested reconsideration of the trial court's in limine ruling and sought to cross-examine Thomas regarding the prior instances of contamination. The trial court declined to overrule its pretrial ruling. During Michaels' trial testimony, Sexton proffered Michaels' deposition testimony regarding his prior instances of contamination "in line [sic] of the State's motion in limine concerning the prior incidents [sic] of the contamination that was testified to by Ms. Johnson [sic]."

A trial court's ruling regarding the scope and limitation of cross-examination rests in the sound discretion of the court and is subject to review for abuse of that discretion. See McCoy v. State, 853 So. 2d 396, 406 (Fla. 2003). It is well-established that evidence of particular acts of misconduct cannot be introduced to

impeach the credibility of a witness. Farinas v. State, 569 So. 2d 425, 429 (Fla. 1990); see §§ 90.608-610, Fla. Stat. (2012).

In Cruse v. State, 588 So. 2d 983, 988 (Fla. 1991), the defendant argued on appeal that the trial court erred by failing to allow cross-examination of a State expert, Dr. Kirkland, as to his examination of a defendant in another capital case, State v. Sireci, 536 So. 2d 231 (Fla. 1988), in which we upheld a trial court's finding that "Dr. Kirkland had rendered an incompetent medical evaluation." The trial court in Cruse "determined that the competency of Dr. Kirkland's evaluation of Sireci was a purely collateral matter, the probative value of which was outweighed by the danger of confusing the issues and misleading the jury." Cruse, 588 So. 2d at 988. We agreed, noting that the "proposed evidence [did] not fall under any of the express ways allowed to attack a witness's credibility" under section 90.608, Florida Statutes (1987). Id. Moreover, "[i]f such inquiry were permissible, every trial involving expert testimony could quickly turn into a battle over the merits of prior opinions by those experts in previous cases . . . ." Id.

The reasoning of Cruse applies here. The evidence at trial showed that when Sexton was arrested, he was wearing the same clothes he had on the night before. Thomas testified that despite the clothes having been washed before they were obtained by law enforcement, she was able to develop complete DNA profiles from blood on Sexton's shirt, shorts, and shoes, each of which matched Parlato's

complete DNA profile.  There was no evidence that the DNA samples in this case were contaminated and the prior instances of contamination were irrelevant to this case.  Accordingly, the trial court did not abuse its discretion in disallowing cross-examination of Thomas regarding prior instances of contamination.

Sexton's claim that the trial court erred in limiting his cross-examination of Michaels is not preserved for review.  The State's motion in limine sought only to preclude cross-examination of Thomas regarding prior instances of contamination in other cases in which she was involved; it made no mention of Michaels.  Michaels' work was not challenged by Sexton at the hearing on the State's motion in limine, and Sexton did not attempt to cross-examine Michaels regarding his prior instances of contamination at trial nor did he receive a ruling from the trial court as to whether or not the court would permit him to do so.  Moreover, even if this claim were preserved and the trial court had limited cross-examination of Michaels regarding his prior instances of contamination, we would conclude that the trial court did not abuse it discretion for the same reasons explained above with regard to Thomas's prior instances of contamination.

## B. Testimony Regarding the Attempted Auto Burglary

Sexton contends that the trial court abused its discretion by treating the proffered testimony of Stephen Tarnowski as reverse Williams[1] rule evidence and excluding it. Sexton asserts that Tarnowski's testimony should have been admitted because it placed other suspects in the vicinity of Parlato's house near the time of the murder. We disagree.

Tarnowski, who lived a few streets away from Parlato, testified in a proffer that on September 23, 2010, he went out on his porch to smoke a cigarette sometime between 1 a.m. and 3 a.m. and observed two shirtless men trying to break into a neighbor's car. When he yelled at the men, they ran away. When Tarnowski learned of Parlato's murder the next day, he went to Parlato's house and reported what he had observed in the early morning hours to a uniformed officer on scene.

The trial court ruled that Tarnowski's testimony was inadmissible as reverse Williams rule evidence, noting there was no evidence that Parlato's home was burglarized.

> "Reverse Williams rule" evidence is evidence of a crime committed by another person that a defendant offers to show his or her innocence of the instant crime. The defendant must demonstrate a "close similarity of facts, a unique or 'fingerprint' type of information" for the reverse Williams rule evidence to be admissible.

---

1. Williams v. State, 110 So. 2d 654 (Fla. 1959).

McDuffie v. State, 970 So. 2d 312, 323 n.2 (Fla. 2007) (citation omitted). Because there was no factual similarity between Parlato's murder and the attempted auto burglary several blocks away, we find no error in the trial court's conclusion that the evidence did not meet the standard for admission as reverse Williams rule evidence. Even assuming that the trial court should not have analyzed the admissibility of Tarnowski's testimony under the reverse Williams rule standard, because the testimony was irrelevant, the trial court did not err in excluding it. See, e.g., Robertson v. State, 829 So. 2d 901, 906 (Fla. 2002) (recognizing that the "tipsy coachman" doctrine is a longstanding principle of appellate law that allows an appellate court to affirm a trial court that reaches the right result but for the wrong reason so long as there is any basis which would support the judgment in the record).

In order for evidence—reverse Williams rule evidence or otherwise—to be admissible, it must be relevant. Evidence is relevant if it tends to prove or disprove a material fact. § 90.401, Fla. Stat. (2012). Sexton contends that Tarnowski's testimony was relevant because it placed other suspects in the area near the time of the murder. But the fact that two people may have attempted to gain access to a vehicle parked several streets away from Parlato's house sometime between 1 a.m. and 3 a.m. on September 23, 2010, does not make them "suspects" in Parlato's murder. And the mere fact that an attempted auto burglary occurred several blocks

- 15 -

away in the general time frame of the murder does not tend to disprove that Sexton murdered Parlato. Thus, Tarnowski's testimony was not relevant. Accordingly, the trial court did not err in excluding it.

### C. Catherine Sexton's Statement to Detectives

Detectives Grady and Hatcher went to Sexton's home during the afternoon of September 23, 2010, to interview him regarding Parlato's murder. During the interview, Sexton's wife, Catherine, came out of the house and joined the three men in the front yard. The interview was recorded and the portion pertinent to this claim was heard by the jury as follows:

SEXTON: Do you know that old lady Ann, the one that talks on the phone when she calls me to do her lawn?

CATHERINE: Uh-huh.

SEXTON: They said they think she was murdered last night.

CATHERINE: Oh, my God.

SEXTON: Because I had driven by there just after I seen you, because her lawn wasn't quite up, but sometimes she wants me to do other things. She's always got a multitude of things she wants done, and I was trying to pick up an extra job, and talking to her around ten minutes.

. . . .

SEXTON: What time did I get home last night? 10:30, maybe? Something like that? [Catherine] doesn't remember.

DETECTIVE HATCHER: All right. So you got home -- you're saying you got home around 10:30 [p.m.]

SEXTON: Around 10:30 [p.m.]

- 16 -

Detective Grady testified that Sexton was addressing his wife when he asked, "What time did I get home last night? 10:30, maybe?" and that immediately after Sexton said he arrived home at 10:30, Catherine said to Detective Grady in a quiet voice that was not picked up on the recording, "He's not telling the truth. He got home at 2:00 a.m." Sexton objected, arguing that Detective Grady's testimony about what Catherine said was hearsay, but the trial court overruled the objection. Sexton now argues that the trial court erred in overruling his hearsay objection and admitting Catherine's statement through Detective Grady.

Sexton is not entitled to relief on this claim. Even if the trial court erred in admitting Catherine's statement through Detective Grady, Catherine testified at trial that Sexton arrived home at 1:55 a.m. on the night of the murder. Thus, the jury still would have heard that, according to Catherine, Sexton actually arrived home at 1:55 a.m. on September 23, 2010. Because admission of the same statement through Detective Grady was merely cumulative to Catherine's trial testimony, we conclude that there is no reasonable possibility that the admission of Catherine's out-of-court statement affected the verdict. Accordingly, any error in admitting the statement through Detective Grady was harmless beyond a reasonable doubt.

## D. Evidence of Postmortem Injuries

Sexton claims that the trial court erred in admitting photographs and testimony relating to injuries that were inflicted on Parlato's body after her death, specifically, the insertion of the vase into the rectum and a rectal tear, the burns to the genital and thigh areas, a stab wound to the abdomen, and the removal of the right breast. Sexton contends that four photographs depicting the deceased victim were not relevant to the cause of death, the identity of the perpetrator, or the issue of premeditation and that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. Sexton further contends that the medical examiner should not have been allowed to testify about the postmortem injuries because they were irrelevant to the cause of death and highly prejudicial.

The admission of photographic evidence is within the trial court's discretion and a ruling on this issue will not be disturbed on appeal absent a clear showing of abuse of discretion. Douglas v. State, 878 So. 2d 1246, 1255 (Fla. 2004); Pangburn v. State, 661 So. 2d 1182, 1187 (Fla. 1995). We have consistently held that "[t]he test for admissibility of photographic evidence is relevancy rather than necessity." Douglas, 878 So. 2d at 1255 (quoting Pope v. State, 679 So. 2d 710, 713 (Fla. 1996)). "[P]hotographs are admissible if they are relevant and not so shocking in nature as to defeat the value of their relevance." Jennings v. State, 123 So. 3d 1101, 1126 (Fla. 2013) (quoting Hertz v. State, 803 So. 2d 629, 641 (Fla.

2001)). "Crime scene photographs are considered relevant when they establish the manner in which the murder was committed, show the position and location of the victim when he or she is found by police, or assist crime scene technicians in explaining the condition of the crime scene when police arrived." Id.

The four challenged photographs depict Parlato's body as it was found on her living room floor. Exhibit 38 shows that Parlato's right breast had been removed and her prosthetic left breast pad was placed over the area from where the right breast had been removed. The photograph was taken from behind Parlato's head, looking toward her feet. The prosthetic breast covered the area where the cutting occurred on the body except for what defense counsel described to the trial court as some "yellow-orange" tissue around the prosthetic. This photograph was used by an expert in blood pattern analysis and crime scene reconstruction to explain that the blood spatter around Parlato's head evidenced that she received at least seven blows while she was in the area in which she was found. Exhibits 93 and 94 show Parlato's body mostly covered by a sheet. Exhibit 93 was taken from a distance, and exhibit 94 shows only Parlato's legs, which appear uninjured. Exhibit 95 shows Parlato's body without the sheet. It was taken from the area of Parlato's feet, looking toward her head. A forensic crime scene investigator used exhibits 93, 94, and 95 to explain the position and condition in which Parlato's body was found. The medical examiner, Dr. Thogmartin, also used the

photographs to describe the way Parlato's body looked when he arrived. He testified that the state in which the body was found supported his opinion that Parlato's death was a homicide. Dr. Thogmartin also used the photographs to illustrate how he concluded that Parlato suffered multiple blunt traumas to her face, a circumstance which was relevant to the element of premeditation.

Because the photographs established the manner in which the murder was committed, showed the position and location of the victim when she was found, and assisted the witnesses in explaining the condition of the crime scene when police arrived, they were undoubtedly relevant. And their gruesome nature was not so shocking as to defeat the value of their relevance or unfairly prejudice Sexton. Accordingly, the trial court did not abuse its discretion in admitting the four challenged photographs. See Pope, 679 So. 2d at 713-14 (finding no abuse of discretion in admission of gruesome crime scene and autopsy photos where photos were relevant to establish the manner in which the murder was committed, to assist the crime scene technician in explaining the condition of the crime scene when the police arrived, and to illustrate the medical examiner's testimony and the injuries he noted on the victim).

In describing his cursory examination of Parlato's body to the jury, Dr. Thogmartin noted that Parlato's right breast had been removed and a vase was protruding from her rectum. The testimony about the abdominal stab wound and

cutting of the breast were relevant to explain the knives at the crime scene, which corroborated and provided context to the neighbors' observations of Sexton washing objects in Parlato's kitchen sink. The testimony about the vase was relevant to describe the condition in which the body was found, and there was testimony that the vase could have been the murder weapon and the object used to commit the sexual battery. Because it could be reasonably inferred from the evidence that Sexton set fire to Parlato's genital and thigh areas in an attempt to destroy evidence related to the sexual battery, the testimony regarding the burn injuries was relevant to show consciousness of guilt. The trial court did not abuse its discretion in allowing this testimony.

### E. Sufficiency of the Evidence

Although Sexton does not challenge the sufficiency of the evidence to sustain his conviction for first-degree murder, this Court independently reviews the record in death penalty cases to determine whether competent, substantial evidence supports the conviction. Fla. R. App. P. 9.142(5) ("On direct appeal in death penalty cases, whether or not insufficiency of the evidence or proportionality is an issue presented for review, the court shall review these issues and, if necessary, remand for the appropriate relief."). "There is sufficient evidence to sustain a conviction if, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a

reasonable doubt." Johnston v. State, 863 So. 2d 271, 283 (Fla. 2003). Where the evidence of guilt is wholly circumstantial, "not only must the evidence be sufficient to establish each element of the offense, but the evidence also must be inconsistent with any reasonable hypothesis of innocence proposed by the defendant." Twilegar v. State, 42 So. 3d 177, 188 (Fla. 2010). Sexton's jury was instructed on theories of both first-degree premeditated murder and first-degree felony murder, with the underlying felony being sexual battery, and returned a general verdict of guilty of first-degree murder without specifying whether the State proved first-degree murder, felony murder, or both. Here, we conclude that a rational trier of fact could have found that the elements of both premeditated and felony murder were proven beyond a reasonable doubt and that the evidence was inconsistent with any reasonable hypothesis of innocence.

Sexton's identity as the killer was proved based on the following: he admitted to being at Parlato's house on the night of September 22, 2010; he was seen at Parlato's house around the time of the murder, appeared to be doing dishes, and knives with Parlato's DNA on them were later found in the sink; he had Parlato's blood on his clothes; cigarette butts with his DNA on them were found in Parlato's house even though she did not allow smoking in the house; and he lied to law enforcement about his whereabouts at the time of the murder.

"Premeditation is a fully formed conscious purpose to kill that may be formed in a moment and need only exist for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act." Asay v. State, 580 So. 2d 610, 612 (Fla. 1991). "Premeditation is a factual issue to be determined by the jury and, like other factual matters, may be established by circumstantial evidence." Twilegar, 42 So. 3d at 190. The evidence established that Parlato was a ninety-four-year-old woman who died as a result of multiple blunt traumas to her face, head, and neck. The bones in her face were crushed. There were so many fractures in her face that it was misshapen and felt "crepitant" or "crunchy" to the medical examiner. Her orbits were fractured and some of the bone penetrated her skull. Her brain was bleeding and bruised. Her spine was dislocated as a result of the impacts to her head. She had several rib fractures. Although Parlato was ninety-four years old, Dr. Thogmartin testified that the amount of blunt trauma inflicted on her would likely have been fatal to anyone. Bloodstain patterns revealed that she was hit numerous times in multiple areas of the home. The whole of these facts provides competent, substantial evidence to support a finding of premeditation.

To prove first-degree felony murder, the State was required to prove that Sexton caused Parlato's death during the commission of a sexual battery. Parlato's body was found nude. The autopsy revealed the presence of three lacerations

inside of the vagina—one of which was six centimeters long—and two at the entry

of the vagina, which were "standing very wide open." The lacerations were

traumatic injuries caused by the insertion of an object into the vagina. All of the

vaginal lacerations bled, meaning Parlato was alive when they were inflicted.

These injuries would have caused horrible pain and were consistent with a forcible

sexual battery. Thus, there is competent, substantial evidence to support a finding

that Parlato's death occurred during the commission of a sexual battery and

therefore to sustain a felony murder conviction.

### F.  Hurst

During the pendency of Sexton's appeal, the United States Supreme Court

issued its decision in Hurst v. Florida, 136 S. Ct. 616, 619 (2016), in which it held

that Florida's former capital sentencing scheme violated the Sixth Amendment

because it "required the judge to hold a separate hearing and determine whether

sufficient aggravating circumstances existed to justify imposing the death penalty"

even though "[t]he Sixth Amendment requires a jury, not a judge, to find each fact

necessary to impose a sentence of death." On remand in Hurst v. State, 202 So. 3d

40, 57 (Fla. 2016), cert. denied, No. 16-998, 2017 WL 635999 (U.S. May 22,

2017), we held that

> before the trial judge may consider imposing a sentence of death, the
> jury in a capital case must unanimously and expressly find all the
> aggravating factors that were proven beyond a reasonable doubt,
> unanimously find that the aggravating factors are sufficient to impose

death, unanimously find that the aggravating factors outweigh the mitigating circumstances, and unanimously recommend a sentence of death.

In light of the nonunanimous jury recommendation to impose a death sentence, it cannot be said that the failure to require a unanimous verdict was harmless. See Franklin v. State, 209 So. 3d 1241, 1248 (Fla. 2016) ("In light of the non-unanimous jury recommendation to impose a death sentence, we reject the State's contention that any Ring[ v. Arizona, 536 U.S. 584 (2002)]- or Hurst v. Florida-related error is harmless."), petition for cert. filed, No. 16-1170 (U.S. Mar. 23, 2017). We therefore reverse Sexton's death sentence and remand for a new penalty phase.

### III. CONCLUSION

For the foregoing reasons, we affirm Sexton's conviction for first-degree murder, but vacate his death sentence and remand for a new penalty phase.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
PARIENTE, J., concurs with an opinion.
LAWSON, J., concurs specially with an opinion.
CANADY, J., concurs in part and dissents in part with an opinion, in which POLSTON, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

PARIENTE, J., concurring.

- 25 -

I concur in the majority's holding to affirm Sexton's conviction and reverse his sentence of death and remand for a new penalty phase in light of Hurst v. Florida, 136 S. Ct. 616 (2016), and Hurst v. State (Hurst), 202 So. 3d 40 (Fla. 2016), cert. denied, No. 16-998, 2017 WL 635999 (U.S. May 22, 2017).  I write separately to expand on the Hurst analysis, specifically reviewing the mitigation presented at trial.

Following the penalty phase in Sexton's trial, the jury recommended a sentence of death by a vote of 10-2.  Majority op. at 9.  At trial, although the State presented evidence of three aggravating factors, which the trial court found and afforded great weight, this Court has no way of knowing which aggravators the jury unanimously determined were proven beyond a reasonable doubt and whether the jury unanimously found the aggravators sufficient to warrant the imposition of the death penalty.[2]  See Hurst, 202 So. 3d at 44.

On the other hand, the defense presented evidence as to three statutory mitigating circumstances.  First, the defense presented Sexton's criminal history, which consisted of "several misdemeanors and at least one felony non-violent crime" to establish that defendant has no significant history of prior criminal

_____

2. Although the majority does not address this claim, Sexton challenges the trial court's finding of the HAC aggravating factor in this appeal.

activity. The trial court assigned this statutory mitigating circumstance moderate weight.

Second, the defense presented evidence to support the mitigating circumstance that the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, which the trial court assigned little weight. This evidence included the fact that Sexton had been diagnosed with anti-social personality traits in 1993. In 2009, he was diagnosed with Major Depressive Disorder. Dr. McClain testified at trial that Sexton suffers from bipolar disorder and alcohol dependency; the trial court found Dr. McClain's testimony credible. Although the trial court rejected Dr. McClain's opinion that Sexton was suffering from a "manic" episode at the time of the murder, the trial court agreed that the "defendant suffers from a mental disease or defect."

Third, the defense presented the testimony of Dr. McClain and Dr. Maher to support the mitigating circumstance that defendant's capacity to appreciate the criminality of his conduct, or to conform his conduct to the requirements of the law, was substantially impaired. The trial court found that this statutory mitigating circumstance was established but assigned it little weight. The defense also presented evidence as to nonstatutory mitigating circumstances regarding the defendant's conduct during trial and incarceration and his amenability to rehabilitation, which the trial court assigned little weight.

The bottom line is that this Court has no way of knowing whether the jury unanimously found that the aggravation outweighed the mitigation, especially in light of the statutory mitigation presented that consisted of no significant history of prior criminal activity and mental impairments. As we reiterated in Hurst, the focus of the harmless error test "is on the effect of the error on the trier-of-fact." 202 So. 3d at 68 (quoting State v. DiGuilio, 491 So. 2d 1129, 1139 (Fla. 1986)). Thus, in light of the jury's 10-2 vote to recommend a sentence of death in Sexton's case, this Court has no way of knowing if the jury unanimously found each aggravating factor, whether the aggravating factors were sufficient to impose death, or whether the aggravating factors outweighed the mitigating circumstances. See id. at 44. Further, this Court cannot speculate why the two jurors who voted to recommend a sentence of life imprisonment determined that a sentence of death was not the appropriate punishment. Thus, I agree with the majority's conclusion that the Hurst error in Sexton's case was not harmless beyond a reasonable doubt.

LAWSON, J., concurring specially.

See Okafor v. State, 42 Fla. L. Weekly S639, S641, 2017 WL 2481266, at *6 (Fla. June 8, 2017) (Lawson, J., concurring specially).

CANADY, J., concurring in part and dissenting in part.

I concur in the decision to affirm Sexton's conviction, but because I conclude that any error under Hurst v. Florida, 136 S. Ct. 616 (2016), was harmless, I dissent from the decision to vacate his death sentence.

I adhere to my view that Hurst v. Florida only requires that the jury find the existence of an aggravating circumstance that renders a defendant eligible for a death sentence. See Hurst v. State, 202 So. 3d 40, 77 (Fla. 2016) (Canady, J., dissenting) (noting "the Hurst v. Florida Court's repeated identification of Florida's failure to require a jury finding of an aggravator as the flaw that renders Florida's death penalty law unconstitutional"), cert. denied, No. 16-998, 2017 WL 635999 (U.S. May 22, 2017); see also Hurst v. Florida, 136 S. Ct. at 624 ("Florida's sentencing scheme, which required the judge alone to find the existence of an aggravating circumstance, is therefore unconstitutional.").

Sexton's jury was instructed on three aggravating circumstances: (1) the victim of the capital felony was particularly vulnerable due to advanced age or disability; (2) the capital felony was committed while Sexton was engaged in the commission of a sexual battery; and (3) the capital felony was especially heinous, atrocious, or cruel (HAC). Although the trial court concluded that all three aggravating circumstances were proven beyond a reasonable doubt, the jury made no specific findings regarding the aggravating circumstances. Where the jury has not been instructed to find an element of the offense, the test for harmless error

- 29 -

asks whether it is clear beyond a reasonable doubt that a rational jury would have found the element of the offense. Neder v. United States, 527 U.S. 1, 18 (1999).

As to the particularly vulnerable due to advanced age or disability aggravator, the evidence established that Parlato was ninety-four years old and used a cane. There was unrebutted testimony from Dr. Thogmartin that she had previously undergone surgery to repair a fractured hip and she was weak. Because of her advanced age, her bones fractured easily.

As to the sexual battery aggravator, Dr. Thogmartin testified that the five vaginal lacerations—one of which was internal and six centimeters long, and two of which were external and "standing very wide open"—were traumatic injuries caused by insertion of an object into the vagina, were consistent with a forcible sexual battery, were inflicted while Parlato was alive, and would have caused horrible pain if she was conscious. Thus, there is no doubt that Parlato was subject to a sexual battery and that the act was nonconsensual either because she was unconscious or in horrible pain.

Finally, as to the HAC aggravator, the evidence established that Parlato was violently beaten about the head and neck. So many bones in her face were fractured that it felt "crunchy" to Dr. Thogmartin. In addition to the vaginal tears and facial trauma, Parlato suffered multiple lacerations, rib fractures, a dislocated spine, and her brain was bleeding and bruised. Although Dr. Thogmartin testified

that Parlato would have been rendered unconscious at some point during the attack, the evidence proves that she was not immediately rendered unconscious. The blood evidence established that Parlato was violently struck at least three times near her front door before she moved into the living room and that she was still upright when at least one of the many additional blows was inflicted in the living room. She also had a defensive wound to a finger.

Based on the evidence presented in this case, it is clear beyond a reasonable doubt that no rational jury would have failed to find that the three aggravators were proven beyond a reasonable doubt. Thus, any error in failing to require a unanimous jury finding regarding the existence of an aggravating circumstance as required by Hurst v. Florida was harmless.

POLSTON, J., concurs.

An Appeal from the Circuit Court in and for Pasco County,
 Mary Morrissey Handsel, Judge - Case No. 512010CF006284A000WS

Howard L. "Rex" Dimmig, II, Public Defender, and Julius J. Aulisio, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida,

 for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Candance M. Sabella, Chief Assistant Attorney General, and Christina Z. Pacheco, Assistant Attorney General, Tampa, Florida,

 for Appellee