# Supreme Court of Florida

_____

No. SC2023-0079

_____

**JOHN SEXTON,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

September 12, 2024

COURIEL, J.

John Sexton, whose conviction we upheld in 2017, appeals the sentence of death he received after a second penalty phase proceeding on remand. Sexton raises eight issues that he contends entitle him to a third penalty phase proceeding. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const. Because each claim fails, we affirm Sexton's sentence.

# I

A jury found Sexton guilty of the first-degree murder of Ann Parlato, a 94-year-old woman. Sexton knew Parlato because he had cut her lawn. He murdered her in her home, where she lived alone. As we previously recounted, the victim's "face had been bludgeoned to the point of being unrecognizable"; her right breast was excised and then covered with a prosthetic breast pad, which she owned due to a mastectomy; and her naked body, which had sustained burns from a purse placed between her legs and set on fire, was left partially covered with a white sheet. *See Sexton v. State*, 221 So. 3d 547, 550 (Fla. 2017). "The bones in her face were crushed"; her brain was "bleeding and bruised"; and her spine was dislocated. *Id.* at 558-59. These are only some of the severe traumas Parlato sustained. *Id.* at 550-51.

By a vote of 10-2, the jury recommended the death penalty. This Court upheld the conviction but remanded under *Hurst v. Florida*, 577 U.S. 92 (2016), for a new penalty phase trial. *Sexton*, 221 So. 3d at 559. On remand, Sexton waived his right to a jury. The penalty phase proceeded as a bench trial before Judge Mary Handsel, who had presided over Sexton's initial guilt and penalty

phases. The court sentenced Sexton to death on January 12, 2023. This appeal concerns whether the court erred in its resentencing.

## II

In December 2018, over a year after we remanded this case, Sexton moved for Judge Handsel's recusal. According to Sexton, recusal became necessary after a pretrial conference during which the following colloquy occurred:

> [COUNSEL FOR THE STATE]: And, of course, we object to these motions. What this death penalty thing has become, based on some unfortunate and I would say unconstitutional decisions by some higher courts is just a racket by which we see the same three or four – and I'm using air quotes here – experts to come in and fleece the public with their supposed services so that they can opine to a variety of things . . . that have little to no bearing on the ultimate issues in the case. So that is the State's position.
>
> [COUNSEL FOR SEXTON]: And perhaps consistent with the State's position, we should just go out to the nearest tree and hang Mr. Sexton.
>
> THE COURT: Counsel, stop. If that's what you're going to do, we're just going to stop.
>
> [COUNSEL FOR SEXTON]: Well, Judge –
>
> THE COURT: No. Stop.
>
> [COUNSEL FOR SEXTON]: You allowed him to belittle the Supreme Court of Florida and the Supreme Court of the United States.

THE COURT: I did not. Listen, you want to use big words, that's fine. You want to talk about a tree and a rope, we're going to be done. Are we clear about that?

[COUNSEL FOR SEXTON]: Yes, ma'am.

THE COURT: We're not playing these games in my courtroom. I don't know where you're from, but you use words like that in my courtroom again, I will hold you in contempt. Are we clear? I am not going to have you playing these games. What he's trying to –

[COUNSEL FOR SEXTON]: I'm not playing games.

THE COURT: You are playing games.

[COUNSEL FOR SEXTON]: No, I'm not, ma'am.

. . . .

THE COURT: Yes, you are.

[COUNSEL FOR SEXTON]: That's my interpretation.

THE COURT: I don't care what – Counsel, stop. I'm telling you right now, stop.

Based on that exchange, Sexton's counsel indicated he intended "to file a motion to disqualify this Court." He asked the court to order the transcript of the exchange above; the judge replied counsel was responsible for obtaining it. In addition, the judge stated: "There's nothing that I've said or done that, as far as I can see, would lead me to recuse myself, but I haven't seen it in writing and so I'll wait

- 4 -

for that." Discussing these events in his recusal motion, Sexton argued the judge had berated his counsel without admonishing the State's counsel for his improper comments.

Judge Handsel denied the recusal motion. Nonetheless, she delegated defense funding decisions to then Chief Judge Anthony Rondolino of the Sixth Judicial Circuit. Judge Rondolino granted some funding requests and denied others. For example, he denied Sexton's request for funding for the mitigation specialist and one of Sexton's attorneys to travel to Oregon, and for the specialist also to travel to Arkansas, to interview Sexton's family. The court reasoned it already had "authorized nearly $60,000 for a variety of experts, investigations, mitigation and associated expenses." In addition, it found counsel did not justify why both professionals—Sexton's attorney and the mitigation specialist—needed to travel to Oregon. Further, several out-of-state witnesses were interviewed telephonically. Ultimately, the court concluded there was "simply no adequate basis for the requested funds" and "no evidence to support a finding of reasonableness and necessity." However, the court separately granted Sexton's request for the mitigation specialist to travel to Texas to interview one of Sexton's sisters,

who—unlike his other sister—had not spoken about Sexton's childhood abuse on the phone.

In addition, Judge Rondolino denied Sexton's motion for funding to visit a doctor to prescribe a PET scan; for the PET scan itself; and for a doctor in California, Dr. Joseph Wu, to testify via video about the PET scan. He reasoned that this Court, in resolving Sexton's initial appeal, had recognized that the testimony of two doctors—who had not seen a brain scan—supported the mitigating circumstances related to Sexton's substantially impaired capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. Because of the testimony of those expert witnesses, the already-granted funding for mental health experts, and the absence of facts showing a PET scan was reasonable and necessary to the defense, the court denied the request for additional funding. It later denied requests to reconsider that ruling.

Before the penalty phase proceeded, Sexton's counsel filed a "Notice to Trial Court," in which Sexton waived his right to a jury trial and stated he would "only permit counsel to present selective mitigation." Sexton reiterated this request at the sentencing

hearing. His counsel expressed concern with Sexton's decision to put on "super soft mitigation," and stated that counsel "ha[d] to be able to present all of the mitigation that we think is warranted."

Initially, the court asked Sexton's counsel to submit a sealed memorandum at the conclusion of the case, listing all mitigation evidence and indicating what Sexton had instructed his attorneys not to present. The court would not consider the memorandum in its sentencing decision; rather, it stated that the memorandum would serve to clarify the record for appellate purposes only. The next day, the court changed its position. Rather than review the requested memorandum, the court would call Kathleen O'Shea, the defendant's mitigation specialist, to testify about mitigation. Sexton personally objected, contending that mitigation "is concessionary by nature" and that the presentation of mitigation evidence that he did not approve would go towards "conceding the guilt of the crime that [he] did not commit." The court, nonetheless, called O'Shea as a witness.

O'Shea testified about witnesses who would have been available to testify had Sexton not opted for selective mitigation. For example, his former friend, if called as a witness, would have

testified about their unstable friendship, Sexton's mental health and drinking, and Sexton's loss of custody over his children. O'Shea also testified about the additional testimony that certain witnesses whom Sexton had called would have given if Sexton had not limited mitigation. For example, one of Sexton's sisters—whose testimony had been "limited" at his request—would have testified about the abuse Sexton faced and his dysfunctional upbringing. Sexton's longtime girlfriend, had she testified more "freely," might have testified about Sexton's drinking and loss of custody over his children. Sexton's daughter, too, would have testified about his explosive episodes.

O'Shea also identified medical professionals who might have testified. Dr. Robert Ouaou, for example, would have testified about Sexton's IQ score compared to his scores in memory and processing speed, which were potentially lower because of long-term exposure to alcohol or to chemicals during his work in construction. Dr. Michael Maher, a psychiatrist, would have expanded on Sexton's cognitive impairments. And Dr. Heather Holmes, a psychologist, among other things would have diagnosed Sexton with bipolar disorder and described his history of psychiatric hospitalizations.

According to O'Shea, Dr. Holmes "would not have opined specifically about the crime, as Mr. Sexton has always maintained his innocence, but she could have said that when he drinks, because of the bipolar disorder and the other stressors, he does have these episodes that include impulsive . . . lashing out behaviors."

Also during the sentencing hearing, the State moved the trial court to take judicial notice of the original trial testimony and exhibits. Sexton's counsel objected on the grounds that resentencing is a de novo proceeding that "starts fresh" and that the transcripts constitute inadmissible hearsay. The court overruled these objections.[1] First, it reasoned, any hearsay objection would have been determined during the original trial—and this Court had upheld the verdict of guilt reached at the conclusion of that trial. Second, taking judicial notice was consistent with a fresh start, as the State would need to refer the court to a particular transcript, witness, or piece of evidence.

---

[1]. Sexton himself had "[n]o objection" to the court "reviewing the transcript of each witness as it previously stood during the original trial."

Based on this reasoning, the court took "judicial notice of the prior trial transcript, including all cross-examination, including all objections, and all previous rulings."  Defense counsel later raised with the court that the State had rested its case without identifying the specific transcripts it sought to introduce into evidence.  The court dismissed the objection, noting: "We're never rested.  They can reopen their case."

The trial court sentenced Sexton to death on January 12, 2023.  It explained in its sentencing order: "This Court has taken judicial notice of the entire court file, which includes transcripts of testimony from the original trial held on April 15, 2013[,] through May 7, 2013, and has considered such testimony."  In addition, the court "reviewed its own extensive trial notes taken during all proceedings," including from the original guilt and penalty phases.

The court also discussed the existence of three aggravating circumstances, each of which it gave great weight: the victim of the capital felony was particularly vulnerable due to her advanced age or disability (§ 921.141(6)(m), Fla. Stat. (2022)); the capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight

after committing or attempting to commit a sexual battery (§ 921.141(6)(d), Fla. Stat.); and the capital felony was especially heinous, atrocious, or cruel (HAC) (§ 921.141(6)(h), Fla. Stat.). In addition, the court gave three mitigating factors little weight: the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance; the capacity of the defendant to appreciate the criminality of his conduct, or to conform his conduct to the requirements of the law, was substantially impaired; and the defendant is amenable to rehabilitation and a productive life in prison. It gave moderate weight to a final mitigating factor—namely, that Sexton had no significant history of prior criminal activity.

After recounting the details of the murder and weighing the aggravating and mitigating factors, the court concluded: "I find that beyond a reasonable doubt . . . the aggravating factors substantially outweigh the mitigating factors. This Court is compelled by law to impose the ultimate penalty in this case."

### III

Sexton argues that eight issues require us to set aside his sentence and remand for a third penalty phase. None do.

- 11 -

## A

Sexton first argues that the trial court erred by denying his requests for funds for a PET scan and any review of that scan, and for travel to Oregon and Arkansas. He contends these denials violated his rights to mitigation, effective assistance of counsel, due process, and equal protection, as well as the mandate of *Ake v. Oklahoma,* 470 U.S. 68 (1985).[2] We disagree.

A trial court's decision to deny a motion for funds for testing will be upheld absent an abuse of discretion. *Rogers v. State,* 783 So. 2d 980, 998 (Fla. 2001). In evaluating whether a court has abused its discretion in denying funds for testing, we consider whether the defendant (1) made a particularized showing of need; and (2) was prejudiced by the court's denial. *Id.* at 999. Sexton has failed to show that the court abused its discretion in denying his testing requests.

---

2. *Ake* concerned under what conditions the State must "provide an indigent defendant with access to competent psychiatric assistance"—ultimately requiring, where a defendant's sanity is shown to be "a significant factor at trial," that the State "assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." 470 U.S. at 77, 83.

Sexton did not make a particularized showing of need for a PET scan—which is "the polestar for whether any diagnostic test should be authorized by the trial court." *Id.* His motion asserted that, "[b]ased on the examination of doctors previously appointed and the Defendant's neurological issues, it has been recommended that the Defendant have a PET scan and an MRI scan of his brain." He provided little support at the hearing, where counsel argued that the brain scan was "important" because the "killing [was] horrendous, almost indefensible." This is insufficient to establish a particularized need for testing—especially since, at the initial sentencing hearing, two expert witnesses testified on brain damage without access to a brain scan. The court had relied on that testimony to establish the statutory mitigating factor that Sexton's capacity to appreciate the criminality of his conduct, or to conform his conduct to the requirements of the law, was substantially impaired. *See Sexton,* 221 So. 3d at 560 (Pariente, J., concurring) (stating that the defense presented testimony to support this mitigating circumstance and that the court "found that this statutory mitigating circumstance was established but assigned it little weight").

Nor did Sexton show prejudice. On resentencing, again without a brain scan, the court concluded that Sexton's capacity to appreciate the criminality of his conduct, or to conform his conduct to the requirements of the law, was substantially impaired. In its sentencing order, the court recognized testimony from two doctors that Sexton's repeated exposure to solvents while working as a waterproofer "could have caused [a] detrimental effect on the frontal lobe of the Defendant's brain" and that, since the brain damage is "progressive," Sexton's impulsiveness could increase over time. It also found that Sexton had a history of alcoholism and mental illness. Thus—although it gave this factor little weight because of Sexton's history of generally conforming his conduct to the requirements of the law—the court recognized this mitigating circumstance in its sentencing decision. Accordingly, the court did not abuse its discretion in denying requests for funding for a PET scan and analysis of that scan. *See Rogers*, 783 So. 2d at 1000 ("[B]ecause the defense was able to provide substantial evidence of [the defendant's] mental health by means other than a PET-Scan . . . and because the trial court found mitigating circumstances related to his mental condition, including a statutory

- 14 -

mitigating circumstance, we do not find that [the defendant] was prejudiced by the denial of the PET-Scan.").

Next, we reject Sexton's argument about travel expenses. Judge Rondolino, to whom Judge Handsel referred requests for travel funding, did in fact authorize payment for Sexton's mitigation specialist to interview one of Sexton's sisters in Texas; the other was interviewed by phone. Judge Rondolino explained his conclusion that no evidence supported the reasonableness and necessity of the additional funds Sexton requested, given that the people with whom the defense wanted to speak could be reached by phone. This counts as a determination on the record that Sexton had failed to make a particularized showing of need for the travel funds. And on these facts, we detect no prejudice to Sexton from the court's denial of the additional travel funds he had sought. *See id.* at 999-1000; *see also San Martin v. State*, 705 So. 2d 1337, 1347 (Fla. 1997).

For similar reasons, we reject Sexton's assertion that all these funding requests were necessary for his counsel to be effective, and that the trial court violated his due process and equal protection rights. Sexton argues the court "substituted its judgment for that of defense counsel in determining that travel to interview witnesses

and neurological testing was unnecessary." But, by statute, the "court retains primary authority and responsibility for determining the reasonableness of" costs like the ones at issue. § 27.5304(3), Fla. Stat. (2022). And while Sexton asserts the court's denials were "only because [Sexton] fell into th[e] special class of indigent defendants" who were appointed private counsel, that speculative argument lacks support in the record, which shows that Sexton was denied the additional funding requests after a careful determination that they were unnecessary—not because of the nature of his representation.[3]

Overall, the record reflects that the trial court carefully analyzed Sexton's funding requests, as required by statute. When appropriate, it granted additional funding. The record does not indicate that the court treated Sexton differently because of the

---

3. For example, as to one request for additional funding for the mitigation specialist to travel out of state, the court found "no evidence to support a finding of reasonableness and necessity" and "no adequate basis for the requested funds." Similarly, as to Sexton's request for funding for a brain scan, the court "consider[ed] what is reasonable and necessary for the Defense to present the matters that the Defense needs to present," and concluded the funding was unnecessary given the prior testimony of expert witnesses and the funds provided for mental health experts.

nature of his representation as an indigent defendant with court-appointed private counsel. His argument that he was denied due process and equal protection on that basis fails.

Sexton also argues the denial of funding violated the command of *Ake v. Oklahoma.* Not so. Sexton had access to a "competent psychiatrist [to] conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake*, 470 U.S. at 83; *see also Middleton v. State*, 220 So. 3d 1152, 1176 (Fla. 2017) (finding defendant's reliance on *Ake* misplaced in part where he was evaluated by several doctors). He claims he was denied "access to the raw materials integral to the building of an effective defense," *Ake*, 470 U.S. at 77—but, as noted, we discern no abuse of discretion in the trial court's funding decisions. To the extent Sexton asserts he should have been granted funding for Dr. Wu, specifically, to conduct the brain scan, no defendant has a right to the work of a specific mental health expert. *Walls v. State*, 926 So. 2d 1156, 1177 (Fla. 2006).

**B**

Sexton next argues the trial court violated his Sixth Amendment right to counsel and to control his defense by calling

- 17 -

his defense mitigation specialist as a court witness. We agree the trial court erred in calling O'Shea, who was part of the defense team, as a witness over Sexton's objection. But we find the error to have been harmless.[4]

Sexton cites *McCoy v. Louisiana* for the proposition that this kind of error is structural and not subject to harmless error review. 584 U.S. 414, 427 (2018). But *McCoy* involved a defendant's "right to insist that counsel refrain from admitting guilt, even when counsel's experience[]-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty." *Id.* at 417. Sexton's guilt was not at issue in the proceeding below, his conviction having already been affirmed by this Court. The mitigating evidence presented dealt with Sexton's bipolar disorder, excessive drinking, and explosive episodes of anger—most of which had been introduced into the record at his first sentencing proceeding—and not his guilt or innocence. And so, mindful that the trial court's error must have been harmful to be reversible, we

---

4. Sexton did not timely object to O'Shea's testimony on attorney-client privilege or attorney work product grounds, so his arguments on that front are unpreserved for our review.

proceed.  *See* § 924.33, Fla. Stat. (2022); *see also Davis v. State*,
347 So. 3d 315, 324 (Fla. 2022) (describing "the plain language of
section 924.33, Florida Statutes (2021), 'which provides that
harmless error analysis is applicable to all judgments' " (footnote
omitted) (quoting *State v. Schopp*, 653 So. 2d 1016, 1020 (Fla.
1995))); *State v. DiGuilio*, 491 So. 2d 1129, 1134 (Fla. 1986) (finding
the "harmless error analysis . . . applicable to all judgments").

It was error to call O'Shea as a court witness.  O'Shea was not
an independent, special counsel appointed by the trial court; she
was a member of the defense team.  Indeed, the trial judge
recognized that "O'Shea is part of the Defense."  While the court
could have chosen to order a presentence investigation report (PSI)
or considered mitigation from the original sentencing, it could not,
against Sexton's wishes, commandeer his mitigation expert and
compel her to testify about mitigation during the penalty phase.

But this error does not require reversal, because "there is no
reasonable possibility that the error contributed to the death
sentence."  *Gaskin v. State*, 361 So. 3d 300, 309 (Fla. 2023).
Although the court recounted O'Shea's testimony in its sentencing
order, it did not rely on her testimony—or even cite it—when

analyzing the specific mitigating factors that defense counsel was pursuing. Nor did the court consider O'Shea's testimony when establishing aggravating circumstances. Moreover, the trial court determined that Parlato's murder was highly aggravated, and gave that and two other aggravating factors great weight. *See Wells v. State*, 364 So. 3d 1005, 1014 (Fla. 2023) (finding harmless error where the court rejected statutory mitigators); *see also Sparre v. State*, 164 So. 3d 1183, 1197 (Fla. 2015) (finding the court's declination to call its own mitigation witnesses was not reversible error given "the two very weighty aggravators").[5]

## C

Sexton also argues that the trial court violated Florida law and his constitutional rights by failing to conduct a de novo penalty phase; taking judicial notice of the prior proceedings; reopening the

---

5. Because Sexton did not waive all mitigation, the trial court did not confront the command of *Muhammad v. State*, 782 So. 2d 343 (Fla. 2001), to order the preparation of a PSI, consider all mitigating evidence in the record, and, in its discretion, "call persons with mitigating evidence as its own witnesses" to present mitigation where the PSI and accompanying records indicate the probability of significant mitigation. *Id.* at 363-64; *see also Marquardt v. State*, 156 So. 3d 464, 489-90 (Fla. 2015) (receding in part from *Muhammad*).

case to assist the State; and relying on facts not in evidence. Sexton is not entitled to relief on these claims.

By statute, the trial court may judicially notice "[r]ecords of any court of this state." *See* § 90.202(6), Fla. Stat. (2022). "Taking judicial notice of such matters is purely a matter of judicial discretion." *Schwab v. State*, 969 So. 2d 318, 322 (Fla. 2007). Here, in doing so, the court did not abuse its discretion. Indeed, it was statutorily required to "consider[] the records" of the prior trial proceedings. *See* § 921.141(4), Fla. Stat. In addition, although "taking judicial notice of an entire prior proceeding . . . does not allow the substance of the underlying materials to be entered into evidence without compliance with the rules of evidence," *Dufour v. State*, 69 So. 3d 235, 254 (Fla. 2011), the trial court had previously resolved admissibility challenges during the initial proceedings and, again, we had already upheld Sexton's conviction.

Sexton also argues the trial court improperly reviewed the transcript from the original penalty phase, and that its having taken judicial notice of those proceedings transformed the resentencing proceeding into one that failed to meet the de novo resentencing requirement. But the court understood its obligation

to conduct a de novo review; expressed an open mind about the case on remand; did not limit itself to the transcripts from the original proceedings in determining Sexton's sentence; and did not rely on such transcripts to predict or mandate any particular result in the resentencing. We discern no harmful error.

**D**

Sexton says it was error for the trial court to have denied his motion to disqualify. He contends the pre-trial conference—during which the court raised the prospect of holding his counsel in contempt if he continued using certain words—created an objective, well-founded fear of bias and impartiality. We reject this.[6]

---

6. The State is correct that Sexton previously sought review of this issue by filing a petition for writ of prohibition in the Second District Court of Appeal, which was denied in an unelaborated order. *Sexton v. State*, 270 So. 3d 1219 (Fla. 2d DCA 2019). The State further acknowledges *Topps v. State*, 865 So. 2d 1253 (Fla. 2004), where we held:

> [U]nelaborated orders denying relief in connection with all extraordinary writ petitions issued by Florida courts shall *not* be deemed to be decisions on the merits which would later bar the litigant from presenting the issue under the doctrines of res judicata or collateral estoppel unless there is a citation to authority or other statement that clearly shows that the issue was considered by the court on the merits and relief was denied.

When presented with a motion to disqualify, a trial judge is permitted to "determine only the legal sufficiency of the motion and . . . not pass on the truth of the facts alleged." Fla. R. Gen. Prac. & Jud. Admin. 2.330(h). In determining legal sufficiency, the Court considers "whether the alleged facts would create in a reasonably prudent person a well-founded fear of not receiving a fair and impartial trial." *Gregory v. State*, 118 So. 3d 770, 778 (Fla. 2013) (quoting *Rodriguez v. State*, 919 So. 2d 1252, 1274 (Fla. 2005)). The fear must be objectively reasonable. *Id.* Further, "the context of the hearing . . . as reflected in the record [is] relevant to understanding whether a movant has a well-founded fear of judicial bias." *Wall v. State*, 238 So. 3d 127, 143 (Fla. 2018) (affirming motion to disqualify as legally insufficient).

Sexton's allegations that he feared an unfair and impartial trial are not objectively reasonable. Sexton's counsel stated,

---

*Id.* at 1258. Under *Topps*, the order below does not constitute a decision on the merits precluding our review. Despite such precedent, the State argues Sexton "should not be able to raise the exact same issue in an extraordinary writ and then again during his direct appeal." We decline to overlook or overrule *Topps* and, therefore, proceed to the merits of this claim.

"[P]erhaps consistent with the State's position, we should just go out to the nearest tree and hang Mr. Sexton." The trial court responded by directing counsel to "stop" and saying, "[Y]ou use words like that in my courtroom again, I will hold you in contempt." This response, directed at counsel's choice of words, does not express bias against Sexton or his counsel.

Sexton also contends the judge became "adversarial" when alerted to defendant's impending motion to recuse. The record supplies no support for this contention. Nor does the judge's warning against "playing games" constitute grounds for recusal. *See Correll v. State*, 698 So. 2d 522, 524-25 (Fla. 1997) (trial judge's comments about a "delaying tactic in death penalty cases" was insufficient to require disqualification). In addition, while Sexton questions whether he should have had to pay for an expedited transcript, any error arising from that fact would be harmless. Sexton was not precluded from moving to disqualify and, moreover, the effect of the denial of the disqualification motion had no reasonable possibility of contributing to Sexton's sentence, given the aggravating circumstances. *See DiGuilio*, 491 So. 2d at 1138

(error is harmless where "there is no reasonable possibility that the error contributed to the conviction").

## E

Sexton contends the trial court violated his Fifth Amendment rights by commenting negatively on his silence in its sentencing order when it stated, "The Defendant has denied his involvement in the death of Mrs. Parlato, so there is no way for the State to even prove that a sexual battery occurred while the victim was alert unless the Defendant testifies."[7]

This statement of fact, in the context of the court's explanation of its conclusions, is no comment on silence. *Cf. Marston v. State*, 136 So. 3d 563, 570-72 (Fla. 2014) (finding harm where, during voir dire, the prosecutor "commented continuously" on, gave "extensive

---

7. The State argues Sexton waived this issue because he did not object during the sentencing hearing when the judge read the sentencing order and did not file a motion challenging his sentence or the order's phrasing. However, the State cites no case in which we have held that a capital defendant who does not contemporaneously object to a court's oral pronouncement of a sentencing order waives his or her right to directly appeal errors in the sentencing order. In addition, defendants need not move to correct a sentencing error where "the death sentence has been imposed and direct appeal jurisdiction is in the supreme court." *See* Fla. R. Crim. P. 3.800(b).

remarks" about, and "demeaned" the defendant's constitutional right to remain silent). In any event, "[c]omments on a defendant's silence are one class of errors subject to the harmless error analysis." *Davis*, 347 So. 3d at 323-24. Harmless error review also applies, more generally, to alleged errors in a sentencing order. *Gonzalez v. State*, 136 So. 3d 1125, 1159-60 (Fla. 2014) (finding harmless error in a "minimally defective" sentencing order). "The focus [of *DiGuilio*'s harmless error test] is on the effect of the error on the trier-of-fact." *DiGuilio*, 491 So. 2d at 1139. It requires "not only a close examination of the permissible evidence on which the jury could have legitimately relied, but an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict." *Id.* at 1138. The trial court's sentencing order, following a bench trial, had no influence over a jury. And we find no other basis for harmful error in this portion of the order.

## F

Sexton argues the trial court's sentencing order failed to meaningfully consider mitigating evidence, including testimony from three of his witnesses about his positive traits. But the court did not err. As Sexton concedes, his trial counsel did not "spell[]

out" the positive mitigating testimony from these witnesses for consideration. *See Ault v. State*, 53 So. 3d 175, 191 (Fla. 2010) (finding the trial court did not err in failing to address a nonstatutory mitigating circumstance the defendant did not raise). Even if the court had found mitigating circumstances related to the testimony of such witnesses, the aggravating factors were proven conclusively, and the court did not abuse its discretion in assigning them great weight. *See Boyd v. State*, 910 So. 2d 167, 192-93 (Fla. 2005) (trial court did not err in assessing mitigating factors and, regardless, any error was harmless where there were "two weighty aggravators").

## G

The sentencing order concludes with this statement: "I find that beyond a reasonable doubt . . . the aggravating factors substantially outweigh the mitigating factors. This Court is compelled by law to impose the ultimate penalty in this case." Sexton argues that these words show that the trial court misunderstood its ability to impose a sentence of life imprisonment.

We disagree. While other words might have been better, the sentencing order—and indeed the entire proceeding at issue, which

occurred on remand after a prior sentence of death—necessarily reflects the court's awareness that a sentence of life imprisonment was within its discretion. The sentencing order cites section 921.141, which provides, in relevant part, that, "after considering all aggravating factors and mitigating circumstances, [the court] may impose a sentence of life imprisonment without the possibility of parole *or* a sentence of death." § 921.141(3)(b), Fla. Stat. (emphasis added). The sentencing order then devotes several pages to each mitigating and aggravating factor.

The court also stated it "reviewed all relevant decisions issued by the Supreme Court of Florida and the United States Supreme Court concerning a judge's responsibility whenever the imposition of the death penalty is considered." And the judge had, at other times in the sentencing proceedings, recognized her discretion. For example, she stated: "We all know what the outcome was in the first sentencing. I can't tell you that's going to be the same. I have no idea. We're going to redo this whole thing." As a whole, the sentencing order and sentencing proceedings show the trial court understood it could consider alternatives to a death sentence.

## H

Sexton's final argument—that Florida's capital sentencing scheme fails to sufficiently reduce the risk of an arbitrary and capricious death sentence in violation of the Eighth and Fourteenth Amendments—is foreclosed by precedent. In *Wells v. State*, the Court rejected the argument that the number of aggravating factors in Florida's death penalty statute, combined with the holding in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020), violates the Eighth Amendment. *See* 364 So. 3d at 1015; *see also Gordon v. State*, 350 So. 3d 25, 36 (Fla. 2022) (reaffirming *Lawrence*). The Court has similarly "repeatedly rejected the argument that the death-penalty statute violates the Eighth Amendment because it fails to sufficiently narrow the class of murderers eligible for the death penalty." *Wells*, 364 So. 3d at 1015 (collecting cases). Sexton provides no reason to recede from such precedent.

**IV**

We affirm Sexton's sentence of death.[8]

It is so ordered.

MUÑIZ, C.J., and CANADY, GROSSHANS, FRANCIS, and SASSO, JJ., concur.
LABARGA, J., concurs specially with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., specially concurring.

I agree with the Court's conclusion in issue III(D) that the trial court did not err in denying Sexton's motion to disqualify. The trial court's response to defense counsel's improper comment was insufficient to demonstrate the requisite bias for granting a motion to disqualify. However, I must note that considering the trial court's strong response to defense counsel's comment, the court did not offer a sufficient response to improper prosecutorial comments that preceded those made by defense counsel.

The trial court and counsel were discussing a possible delay in resentencing Sexton, and the record reveals that the prosecutor was

---

8. Previously, we determined that competent, substantial evidence supports Sexton's conviction. *See Sexton*, 221 So. 3d at 558-59.

frustrated with this prospect. Just before the comment from defense counsel that triggered a strong response from the trial court, the prosecutor said the following:

> And, of course, we object to these motions. What this death penalty thing has become, based on some unfortunate and I would say unconstitutional decisions by some higher courts is just a racket by which we see the same three or four—and I'm using air quotes here— experts to come in and fleece the public with their supposed services so that they can opine to a variety of things . . . that have little to no bearing on the ultimate issues in the case.
> So that is the State's position.

Apparently, these comments were not as inflammatory to the trial court as those which followed by defense counsel. However, referring to certain court proceedings as "a racket," questioning the legitimacy of experts, and accusing those experts of "fleec[ing] the public"—in a death penalty case, no less—were also deserving of the trial court's rebuke.

An Appeal from the Circuit Court in and for Pasco County,
    Mary M. Handsel, Judge
    Case No. 512010CF006284CFAXWS

Howard L. "Rex" Dimmig, II, Public Defender, and Karen M. Kinney, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida,

    for Appellant

Ashley Moody, Attorney General, Tallahassee, Florida, and Christina Z. Pacheco, Senior Assistant Attorney General, Tampa, Florida,

    for Appellee